UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Feroniki Katerina Kutsomarkos,                    Case No.: 20-43741
                                                  Chapter 7
          Debtor.                                 Hon. Mark A. Randon
_____/

Michael Bojkovic, M.D.,

          Plaintiff,

v.                                                Adversary Proceeding
                                                  Case No.: 20-04348

Feroniki Katerina Kutsomarkos,

          Defendant.
_____/

## OPINION AND ORDER DENYING MICHAEL BOJKOVIC, M.D.'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Rakesh Dixit convinced Michael Bojkovic, M.D. to invest heavily in the

development of *FIT Platform*, a promising and potentially lucrative exchange technology

designed to assist health insurance companies comply with the Affordable Care Act.  It

was a confidence trick: Dixit knew *FIT Platform* was nothing more than a knockoff of

HealthPlan Services' ("HPS") platform, which cost HPS more than $100 million and took

it nearly two years to develop.

Dr. Bojkovic alleges Dixit conspired with Debtor, Feroniki Kutsomarkos, to

defraud him out of the $1,001,325.00 he invested in *FIT Platform*.  Dixit and

Kutsomarkos worked for HPS during the development of HPS's platform, which Dixit would later pirate. Dixit also brought Kutsomarkos into the *FIT Platform* project as its marketing specialist. They had overlapping business connections and a friendly relationship, which became romantic.

After Dixit's wrongdoing was exposed, Dr. Bojkovic filed a lawsuit against him, Kutsomarkos, and others involved in the *FIT Platform* project. The parties settled the lawsuit with Kutsomarkos's liability capped at $1.25 million. However, Kutsomarkos filed Chapter 7 bankruptcy before the first settlement payment was due.

Dr. Bojkovic filed a two-count adversary proceeding challenging the dischargeability of the debt under 11 U.S.C. § 523(a)(2)(A). Count I alleges Kutsomarkos engaged and participated in a continuing fraud on Dr. Bojkovic with the intent of deceiving and inducing him to continue to fund the *FIT Platform* project for her financial benefit. Count II alleges Kutsomarkos's promise to pay Dr. Bojkovic under the terms of the Settlement Agreement was false and made in bad faith, or with gross recklessness as to its truth, because she had no intention to make the monthly payments.

Dr. Bojkovic's motion for summary judgment is pending. Faced with overwhelming evidence that Kutsomarkos knew the *FIT Platform* was just a perfunctory re-branding of the HPS-owned platform, her role in the *FIT* project, and her close personal and professional relationship with Dixit, she clings to two lifelines: (1) Dixit reassured her that his company, E-integrate, had purchased the use of HPS's platform

content, thus she was an unwitting participant in Dixit's scheme; and (2) she intended to earn her portion of the settlement payments Dixit promised to pay by working for him on another project. By a fine margin, these create genuine issues of material fact, and the Court **DENIES** Dr. Bojkovic's motion for summary judgment.

## II.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Pittman v. Cuyahoga County Dep't of Children Services*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The Court must draw all reasonable inferences in favor of the party opposing the motion. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011). However, "[t]he nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [she] must go beyond the pleadings and support [her] contentions with proper documentary evidence." *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

To support their respective positions, each party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir. 2001) ("the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact").

## III. BACKGROUND

### A. *Dixit and Kutsomarkos's Roles in the Development and Marketing of HPS's Insurance Exchange Platform*

#### 1. Background of HPS's Platform

In January of 2012, HPS began developing a platform containing the technology that large health insurance companies needed to adhere to the new regulations under the Affordable Care Act.[1] HPS spent over $100 million to build the platform and had anywhere between 275-650 Information Technology (IT) employees and contractors working on it at any given time.[2] It took 22 months for the platform to become

---

[1]Docket Number 81, Ex. 6-1- Deposition of James Vertino taken August 24, 2017 in FIT Lawsuit, pages 17-20, 22.

[2]*Id.* at page 23.

-4-

operational.[3]  Because HPS claimed ownership of the platform, every independent contractor and employee was required to sign a master services agreement that protected its intellectual property.[4]

HPS's platform contained five modules.  ExchangeLink loaded and issued a policy for an individual.  ServiceLink did the billing and premium collection.  The ServiceLink Portal was the interface for administering the policy and providing customer service.  The ExchangeLink Management Console visualized the transactions coming to and going out of the overall platform.  Configurator took all of the data from the insurance carrier and put it into the overall platform.[5]

### 2. Dixit's Employment with HPS

Dixit worked with HPS on its platform as an independent contractor until around June of 2014, when HPS hired him as Vice President of Product Development.  Dixit's company, E-Integrate, was still doing work for HPS at the time.[6]

Dixit used his expertise as a higher-level architect to assist primarily with developing the "back end" of the ExchangeLink module.  However, he had access to the

---

[3] *Id.* at page 22.

[4] *Id.* at pages 31-32.

[5] *Id.* at pages 20-22.

[6] *Id.* at pages 33-35.

-5-

technology for all five of the modules and helped weave them together.[7]  Dixit held his

position for less than a year before HPS terminated his employment for putting a "time

bomb" in the software HPS was developing, which prevented the software from

functioning after a period of time.  Dixit allegedly did this because he believed HPS–or

one of its contractors–owed him $750,000.00.[8]

### 3. Kutsomarkos's Employment with HPS

Before his relationship with HPS soured, Dixit introduced HPS to Kutsomarkos as

an individual with expertise in creating movies and demonstrations.[9]  Dixit also informed

HPS that she was the sole owner of a company called Media Shark.[10]  At least one of

Dixit's companies provided services to Media Shark and vice versa.  Their companies

also shared office space, and used the same CPA and banking institution.[11]

In 2012, HPS hired Kutsomarkos as a business analyst.[12]  Months later, Dixit was

involved in her transition to the Advanced Demonstration Services Group where she

---

[7]*Id.* at pages 28-29.

[8]*Id.* at pages 45-47, 156, 167-169.

[9]*Id.* at page 36.

[10]*Id.*; *see also* Docket Number 82, Ex. 6-31 - Kutsomarkos Deposition taken December 1, 2017 in FIT Lawsuit, page 10.

[11]Docket Number 81, Ex. 6-2 - Deposition of Feron Kutsomarkos taken May 25, 2021, pages 28-29, 32-33, 50-51, 64-65, 91-92, 106; *see also* Docket Number 82, Ex. 6-31, pages 110-111, 197-198.

[12]Docket Number 81, Ex. 6-2, pages 11, 19.

demonstrated HPS's platform to its clients and prospective clients.[13]  Dixit helped

Kutsomarkos develop scripts for the voice over on movies and her in-person

demonstrations.[14]  HPS claimed ownership of the content that was developed.[15]  The

Independent Contractor Agreement between HPS and Media Shark provides:

> The Contractor agrees and covenants that it shall not, during the time the
> Contractor is performing services for the Company and for a period of two
> (2) years following the end of the performance of services by the Contractor
> for the Company, for any reason, disseminate, disclose, use, communicate,
> publish or otherwise divulge, directly or indirectly, on behalf of himself or
> others, any Confidential Information, except in the course of the
> performance of authorized duties on behalf of and for the benefit of the
> Company, and only as necessary to perform such duties, or with the prior
> written consent of the Company.  The Contractor agrees to use the
> Confidential Information solely in furtherance of the business of the
> Company and not to use any Confidential Information in connection with or
> furtherance of any other business activity.[16]

Kutsomarkos worked with HPS until 2018.[17]

### B.    Dixit and Kutsomarkos's Roles in the Development and Marketing of the FIT Platform

#### 1.    Dixit and Dr. Bojkovic's Joint Venture

---

[13]Docket Number 81, Ex. 6-3 part 3 - Deposition of Rakesh Dixit taken July 6 and 8, 2021, page 54; *see also* Docket Number 81, Ex. 6-1, pages 36-37; *see also* Docket Number 81, Ex. 6-2, page 18; *see also* Docket Number 82, Ex. 6-31, page 19.

[14]Docket Number 81, Ex. 6-3 part 3, pages 59-60.

[15]Docket Number 81, Ex. 6-1, page 38.

[16]Docket Number 81, Ex. 6-8 - Independent Contractor Agreement, HPS and Media Shark, Feb. 3, 2014, pages 4-5.

[17]Docket Number 81, Ex. 6-2, page 32.

Shortly after HPS terminated Dixit's employment, he began "developing" the *FIT Platform*, a software platform that small to medium-sized private health insurance carriers could use to more efficiently and profitably compete under the Affordable Care Act. Dixit knew that Dr. Bojkovic was a physician who owned a healthcare company. As such, in the later part of 2014, Dixit approached Dr. Bojkovic with an opportunity to invest in the *FIT Platform*.[18] They agreed that it would be a joint venture with each funding 50 percent.[19] Dr. Bojkovic paid over $1 million into the project while Dixit "directed everything on the FIT project" and did not make any payments into the *FIT* project.[20]

### 2. Kutsomarkos's Position with the *FIT Platform*

In August of 2015–while still working for and being paid by HPS–Kutsomarkos agreed to work on the marketing and branding aspects of the *FIT Platform*.[21] She testified at her deposition that she "did make it clear to [Dr. Bojkovic] that [HPS] was where [her] priority was and that was part of the reason why [she] would never be client facing, and that the only time [she] would have taken a permanent position with FIT is if

---

[18]Docket Number 81, Ex. 6-10 - Affidavit of Dr. Bojkovic dated August 8, 2019, page 2.

[19]Docket Number 81, Ex. 6-3 part 6, pages 117-118.

[20]Docket Number 81, Ex. 6-3 part 7, page 131; *see also* Docket Number 84, Ex. 6-75 - Spreadsheet of Payments on Project.

[21]Docket Number 81, Ex. 6-2, pages 96, 100-101; *see also* Docket Number 82, Ex. 6-31, page 80.

[her] engagement with HPS ended."[22]  Kutsomarkos also agreed to be paid $13,750.00

per month but "never had an issue" when she did not receive that amount.[23]  According to

Kutsomarkos, she believed she would only receive that amount if she became a full-time

officer with the *FIT* project, which never occurred.[24]

Kutsomarkos believed her duties were "to brand [the *FIT Platform*], make sure

that it looked good with the UI, the user interface was branded in accordance to a certain

style guide, and it was going to be taken over from there."[25]  She never intended to

demonstrate the *FIT Platform* capabilities to anyone: "That all went through Rak

[Dixit]."[26] She also would not help Dixit contact insurance carrier clients for feedback

about the product development.[27]

### 3.    Kutsomarkos's Video for the *FIT Platform*

In late 2015, Dr. Bojkovic began to suspect financial improprieties with the *FIT*

project.  He asked Dixit about the progress of the project and where the money was

going.[28]  In response, Kutsomarkos recorded her voice on a video speaking to the

---

[22]Docket Number 82, Ex. 6-31, page 152.

[23]Docket Number 81, Ex. 6-2, page 98.

[24]*Id.*; *see also* Docket Number 82, Ex. 6-31, page 241.

[25]Docket Number 82, Ex. 6-31, page 87.

[26]*Id.* at page 86.

[27]Docket Number 81, Ex. 6-3 part 7, page 133.

[28]Docket Number 81, Ex. 6-10, page 14.

functionalities of the software.[29] According to Kutsomarkos, she was able to learn the capabilities of the *FIT Platform* because "[t]his is what I do for a living[;] this is what I've been focusing my work on for the last five years."[30] She did not even need a script for the video; she spoke from memory.[31] When asked at her deposition about the similarities between the video she did for the *FIT Platform* and the one for HPS, she gave the following testimony:

> Q.   Well, the – you say the word speak to it, but how did you know how to so flawlessly demonstrate the capabilities of this software platform?
>
> A.   Because it was similar to what I do elsewhere.
>
> Q.   For HPS?
>
> A.   Yes.
>
> Q.   Okay.   Did you ever provide a demonstration for e-Integrate?
>
> A.   No.
>
> Q.   Just HPS?
>
> A.   Yes.

*     *     *

---

[29]Docket Number 81, Ex. 6-3 part 7, page 131.

[30]Docket Number 82, Ex. 6-31, page 119.

[31]*Id.* at page 118.

Q.      Feron, have you ever demonstrated this process, this very process flow or technology before or other than in connection with the FIT project?

A.      I have demonstrated a similar process flow on behalf of HPS.

Q.      Okay.  How similar?

A.      Quite similar.

Q.      Identical?

A.      Well, the process is the process.  So, yes.  That is how files are processed.[32]

Kutsomarkos never told Dr. Bojkovic about the striking similarities between the *FIT* and HPS platforms.[33]  She explained that she had a meeting with Dixit that "probably" occurred at the data center in which she asked him why the *FIT Platform* video looked similar to HPS's.[34]  Dixit supposedly told her that E-Integrate purchased the technology depicted in the *FIT Platform* video from HPS, and showed her one page of a contract that listed the assets E-Integrate could reuse outside of HPS.[35]  Dixit did not recall such a meeting or showing Kutsomarkos any documentation of what assets E-

---

[32]*Id.* at pages 120, 127.

[33]*Id.* at page 153.

[34]*Id.* at pages 135-136.

[35]*Id.* at pages 110, 121, 137, 149, 204, 207; *see also* Docket Number 81, Ex. 6-2, pages 31, 146-149, 152-154; *see also* Docket Number 84, Ex. 6-69 part 2 - Exhibit F Pre-existing Property, page 20 of 41 (CM/ECF pagination).

Integrate owned.[36]  Nevertheless, Kutsomarkos says she accepted Dixit's word and was

comfortable with proceeding even though E-Integrate had access to HPS's technology as

a former contractor to HPS; she knew that HPS terminated Dixit's employment; there was

unpleasantness between Dixit and HPS over his departure; and she only "assumed" that

all legal matters between E-Integrate, HPS, and Dixit were resolved.[37]

Kutsomarkos further explained that the *FIT Platform* video was similar to the HPS

video in every way on the "front end," but her understanding from Dixit was that it

differed on the "back end."[38]  She understood this to mean that the process was the same

and there were similarities in the user interface, but the technology involved two

completely competing developments: HPS used an IBM on-premise stack; the *FIT*

*Platform* used an open-source cloud base.[39]  Again, Kutsomarkos accepted Dixit's word

because she was not a software person and did not create the technology.[40]

The video that was produced for the *FIT Platform* was only shown to Dr.

Bojkovic: "[I]t wasn't supposed to get out beyond Dr. Bojkovic because it was an

---

[36]Docket Number 81, Ex. 6-3 part 6, pages 113-115.

[37]Docket Number 82, Ex. 6-31, pages 137, 139-140, 142-143.

[38]*Id.* at pages 149-150, 157, 160; *see also* Docket Number 81, Ex. 6-2, pages 158-159.

[39]Docket Number 82, Ex. 6-31, pages 131, 149-151; *see also* Docket Number 81, Ex. 6-2, pages 155-159.

[40]Docket Number 82, Ex. 6-31, pages 132, 150.

-12-

unprofessional video[.]"[41]  According to Kutsomarkos, it was "absolutely not" a tool to be used to demonstrate to potential customers of *FIT* because "[i]t wasn't a formal demonstration.  It wasn't spoken to in that manner.  It was me acting like I'm talking to [Dr. Bojkovic] because I was envisioning him on the other end[.]"[42]

### 4.    James Vertino Explains the Similarities Between HPS's Platform and the *FIT Platform*

James Vertino, the former Chief Information Officer of HPS, testified at his deposition that the *FIT Platform* was estimated to cost $1.1 million.  He indicated that a healthcare exchange platform could only be built for a million dollars if all of the source code was copied.  According to Vertino, it costs a million dollars just to change the logos.[43]  In addition, Vertino opined that unless it was copied from HPS technology, it would have taken a minimum of two to two and a half years with 60-70 people to develop the technology behind the *FIT Platform* video.[44]

Vertino indicated the *FIT Platform* video was an exact copy of the Configurator that he built in 2012 with the exception of red bars on the side and top.[45]  He recognized Kutsomarkos's voice on the video and indicated that "the font, the location, all the data,

---

[41]Docket Number 81, Ex. 6-2, page 146.

[42]Docket Number 82, Ex. 6-31, page 85.

[43]Docket Number 81, Ex. 6-1, pages 126-127.

[44]*Id.* at pages 269-270.

[45]*Id.* at pages 54-55.

and you know, the way that Feron talks about it is the exact script that her and I directly used with each of our clients that we demonstrated [for HPS]."[46]  When Vertino was shown a screen shot from the *FIT Platform* video, he testified that it was an exact copy of a screen shot for the HPS Platform with very minor changes such as the color scheme.  It was a mirror image except the *FIT Platform* had the add path below and the change path above, where in ExchangeLink, the add path was above and the change path was below.[47]  More importantly, Vertino testified that HPS developed the four quadrants of the exchange business, which was the core fundamental part of the design of the system; the *FIT Platform* was identical with slightly different terminology used.[48]  "They didn't even change things that they weren't ever able to do in it.  They kept the column heading exactly the same."[49]

Vertino testified that the first page he reviewed at his deposition was an exact copy with minor design elements: they both used the words "Overview," and contained a pie chart and a map with a status bar.[50]  The second page had the same heat map as HPS's Platform and the same chart that contained HPS's words: "Pending Binder Payment,"

---

[46]*Id.* at page 55.

[47]*Id.* at pages 56-57.

[48]*Id.* at page 57.

[49]*Id.* at page 59.

[50]*Id.* at page 71.

-14-

"Issued," and "Errors."[51] The third page was "an exact copy of our [HPS] technology."[52] The fourth page had the same plans as HPS: Catastrophic, Dental, Bronze, Silver, Gold, and Platinum.[53]  The fifth and sixth pages had an exact copy of HPS's business process flow diagram, which is one of the most core components of the ExchangeLink Management Console. It also showed the exact pie chart, but used slightly different wording: the *FIT Platform* says "Feeds Overview by Exchange"; HPS used "Feed Details by Exchange."[54]  He also testified that "every single piece of the Confgurator was directly copied[.]"[55] When Vertino first saw the *FIT* video, he thought it was "stolen" from HPS: it was "totally impossible" for someone to create software that does the things seen in Kutsomarkos's video and not have stolen any of HPS's software.[56]  "They are selling a capability.  They are selling an idea.  That idea is HPS's."[57]

---

[51]*Id.* at pages 71-72.

[52]*Id.* at page 72.

[53]*Id.* at pages 72-73.

[54]*Id.* at pages 73-74.

[55]*Id.* at page 83.

[56]*Id.* at pages 116, 246.

[57]*Id.* at page 247.

-15-

When Kutsomarkos was asked about Vertino's testimony, she indicted, "So this is why I[] [did not offer] to demo on behalf of FIT. I demonstrate for HealthPlan Services and no one else[.]"[58]

### 5. Hand-off of the *FIT Platform* to Dr. Bojkovic

Development of the *FIT Platform* ended abruptly. Kutsomarkos ran a hand-off meeting on January 20, 2016, in which the software components and Kutsomarkos's marketing and branding materials were uploaded to a cloud service for Dr. Bojkovic to access.[59] No backup was retained, Kutsomarkos lost access to her email address she used for the *FIT* project, and they used a cloud service that was only prepaid for 30 days even though all of the materials could fit on a flash drive.[60] Dr. Bojkovic's friend accessed the cloud but, unsurprisingly, nothing was on it that would indicate substantial progress on a custom development.[61]

After the hand-off meeting, Dr. Bojkovic asked Kutsomarkos to work with him on another project, but she declined. She "wanted to stay away from whatever legal issues he and Rak were having."[62] However, Kutsomarkos worked on another project with Dixit

---

[58]Docket Number 82, Ex. 6-31, page 130.

[59]Docket Number 81, Ex. 6-2, pages 179-182, 188.

[60]*Id.* at pages 144, 185-186; Docket Number 82, Ex. 6-31, pages 46-48, 281, 312.

[61]Docket Number 83, Ex. 6-42 - Deposition of Kamal Nasser taken February 3, 2017 in FIT Lawsuit, pages 41-46.

[62]Docket Number 82, Ex. 6-31, page 88.

without hesitation.[63]  Their working relationship became intimate and romantic after the

*FIT* project.[64] Kutsomarkos also transferred Media Shark–and access to her Media Shark

email address–to Dixit in 2018.[65]  Dixit was supposed to pay Kutsomarkos $175,000.00

for the company but–according to Kutsomarkos– "that never happened."[66]

### C.  *Lawsuits Filed Against Dixit and Kutsomarkos*

#### 1.  Dr. Bojkovic's Lawsuit Ends with a Settlement Agreement

On February 26, 2016, Dr. Bojkovic filed a lawsuit in the Circuit Court of the

Sixth Judicial Circuit in and for Pinellas County, Florida against Dixit for breach of

fiduciary duty and conversion.[67]  His Amended Complaint was filed on January 29, 2018,

against Dixit, E-Integrate, Kutsomarkos, Media Shark, and other defendants for

fraudulent inducement, negligent misrepresentation, fraud, aiding and abetting, breach of

fiduciary duty, negligence for hand-off, money had and received, unjust enrichment,

breach of fiduciary duty, breach of oral partnership, and deceptive and unfair trade

---

[63]*Id.* at pages 88-89.

[64]Docket Number 81, Ex. 6-3 part 5, pages 98-99; *see also* Docket Number 81, Ex. 6-2, pages 63-64.

[65]Docket Number 81, Ex. 6-2, pages 30, 78, 92; *see also* Kutsomarkos's Statement of Financial Affairs for Individuals Filing for Bankruptcy, indicating she transferred Media Shark to Rak Dixit in 2018 for $0.

[66]Docket Number 81, Ex. 6-2, page 81.

[67]*Michael Bojkovic, et al v. Rakesh Dixit, et al*, Case Number 16-001246-CI, https://ccmspa.pinellascounty.org/PublicAccess/CaseDetail.aspx?CaseID=17237665 (last assessed November 26, 2021).

-17-

practices.[68] Dr. Bojkovic's Second Amended Complaint filed February 15, 2019, added counts for civil theft and civil action for pattern of criminal activity.[69] The Third Amended Complaint filed on March 29, 2019, added punitive damages.[70] Dixit's brother represented Kutsomarkos in the lawsuit; she did not pay any legal fees.[71]

The lawsuit ended with a Settlement Agreement in which Kutsomarkos agreed to be jointly and severally obligated to pay Dr. Bojkovic $2,500,000.00; Kutsomarkos's obligation was capped at $1,250,000.00. Monthly payments were supposed to begin on March 15, 2020, in the amount of $33,333.33.[72] Kutsomarkos filed Chapter 7 bankruptcy two days before the first payment was due.[73]

Kutsomarkos had no source of income, believed Dixit would make all of the payments and, in exchange, she would help Dixit on another project to earn her payments. Specifically, Kutsomarkos testified at her deposition that Dixit told her, "I've got another project lined up, I think I can handle these payments, you guys won't have to pay, but it

---

[68]*Id.* at Docket Number 26.

[69]*Id.* at Docket Number 266.

[70]*Id.* at Docket Number 330; *see also* Docket Number 84, Ex. 6-72 - Third Amended Complaint in FIT Lawsuit.

[71]Docket Number 81, Ex. 6-2, page 205.

[72]Docket Number 84, Ex. 6-71 - Settlement Agreement and Mutual General Release.

[73]*In re Feroniki Katerina Kutsomarkos*, Case Number 20-43741, United States Bankruptcy Court for the Eastern District of Michigan.

-18-

might be quid pro quo where you need to give me some services free of charge on the project."[74]

## 2. HPS's Lawsuit Ends with a Default Judgment

On October 23, 2018, HPS filed a lawsuit in the United States District Court for the Middle District of Florida against Dixit, Kutsomarkos, E-Integrate, Media Shark and another company for violation of Defend Trade Secrets Act, violation of Florida's Deceptive and Unfair Trade Practices Act, common law unfair competition, copyright infringement, contributory copyright infringement, induced copyright infringement, vicarious copyright infringement, and breach of contract.[75] A Second Amended Complaint was filed on December 17, 2018, removing the induced copyright infringement count.[76] Again, Dixit's brother represented Kutsomarkos; she did not have to pay any legal fees.[77]

HPS obtained a default judgment on July 22, 2021, in the amount of: (1) $9,742,453.36 jointly and severally against Dixit, Media Shark, E-Integrate and another company; (2) $723,825.24 against Media Shark; and (3) $775,450.69 against E-

---

[74]Docket Number 81, Ex. 6-2, page 209.

[75]*Healthplan Services, Inc. v. Dixit et al*, Case Number 8:18-cv-02608-SDM-AAS.

[76]*Id.* at Docket Number 37.

[77]Docket Number 81, Ex. 6-2, pages 205-206.

Integrate.[78]  HPS refrained from moving for a default against Kutsomarkos because she

filed bankruptcy.[79]

## IV.  APPLICABLE LAW AND ANALYSIS

### A.  *Equitable and Judicial Estoppel do not Apply*

Section 4.b. of the Settlement Agreement from Dr. Bojkovic's lawsuit provides:

> In the event any of the Monthly Payments of the Dixit Parties Settlement
> Payment is not fully and timely made or cured, the Bojkovic Parties shall be
> entitled to immediate entry of a judgment in the FIT Lawsuit for recovery of
> damages, interest, attorneys' fees and costs in the form attached hereto as
> Exhibit "B," which *shall be entered based on the claims and allegations
> contained in the Third Amended Complaint*.

(Emphasis added).  Based on the italicized language, Dr. Bojkovic argues that he does not

have to prove Kutsomarkos engaged in fraudulent and deceptive conduct because she

stipulated to the factual allegations in the Third Amended Complaint.  According to Dr.

Bojkovic, Kutsomarkos is judicially and equitably estopped from taking a position

contrary to her stipulation.

Judicial estoppel prevents a party from asserting a position contrary to one

previously asserted under oath in a prior proceeding where the prior court adopted the

contrary position either as a preliminary matter or part of a final disposition. *In re Zenga*,

562 B.R. 341, 349 (B.A.P. 6th Cir. 2017) (citations omitted).

---

[78]Docket Number 85.

[79]HPS filed a nondischargeability complaint in Kutsomarkos's bankruptcy, Case
Number 20-04377.  The parties settled that adversary proceeding on September 20, 2021.

To establish equitable estoppel, a party must prove three elements: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel. *Id.* at 350 (citations omitted).

The triggering event that would entitle Dr. Bojkovic to entry of a judgment based on fraud was a missed monthly payment. Because Kutsomarkos filed bankruptcy before the first monthly payment was due, the triggering event never occurred. As such, Kutsomarkos is not taking a contrary position necessary for judicial estoppel, and the misrepresentation element is missing for equitable estoppel. Dr. Bojkovic must prove fraud under section 523(a)(A) to obtain a judgment of nondischargeability in this adversary proceeding.

### B. There are Genuine Issues of Material Fact Regarding Whether the Debt is Nondischargeable

Section 523(a)(2)(A) provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by[] false pretenses, a false representation, or actual fraud[.]" This statute is phrased in the disjunctive; the Court finds false pretenses and actual fraud apply in this case.

"When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Mellon Bank v. Vitanovich (In re*

-21-

*Vitanovich*), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). Actual fraud "'encompasses any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir. 2000) (quoting 4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523-45 (15th ed. Lawrence P. King ed,. 2000)). It does not require proof of a misrepresentation or reliance. *In re Vitanovich*, 259 B.R. at 877 (citing *McClellan*, 217 F.3d at 892) (explaining "actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions"). Actual fraud requires the intent to deceive. *Sullivan v. Glenn (In re Glenn),* 502 B.R. 516, 532 (Bankr. N.D. Ill. 2013).

False pretenses are "implied misrepresentations intended to create and foster a false impression." It includes conduct and material omissions. *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (B.A.P. 10th Cir. 2013). A debt that arises from a fraudulent scheme may be nondischargeable–against all co-conspirators–based on the totality of the circumstances:

> Implied misrepresentations that are intended to create and foster a false impression by co-conspirators in furtherance of a fraudulent scheme may be attributed to a debtor who is an active, willing and knowing participant in the fraudulent scheme for purposes of Section 523(a)(2)(A). Fraudulent intent for purposes of Section 523(a)(2)(A) can be shown by establishing that the debtor was a willing participant in a fraudulent scheme and thereby intended to deceive a creditor.

*Id.* at 223-224 (internal citation omitted).

### 1. Count I - Intent to Deceive

-22-

The evidence presented leaves no doubt that Dixit masterminded a scheme to trick Dr. Bojkovic into investing over a million dollars in a sham project. The issue is whether Kutsomarkos participated in the scheme with the intent to deceive Dr. Bojkovic.

Based on the fact that she was brought into the *FIT* project towards the end, her explanation about why she did not question partial payments, and her testimony that she questioned Dixit about the similarities between the *FIT Platform* and HPS's Platform, there remains a slight possibility that Kutsomarkos was an unwitting participant in Dixit's fraudulent scheme. Therefore, sufficient evidence exists for Kutsomarkos to survive summary judgment on Count I of Dr. Bojkovic's complaint.

### 2. Count II - Intent to Pay under Settlement Agreement

Dr. Bojkovic argues that he is entitled to summary judgment on Count II because Kutsomarkos had no intention of paying the debt under the Settlement Agreement. According to Dr. Bojkovic, Kutsomarkos misrepresented to Dr. Bojkovic that she would make the monthly payments by signing the Settlement Agreement while testifying at her deposition that she had no intention to make the payments and relied on Dixit to pay.

"[A] debtor's inability to pay the debt, by itself, is not enough to prove fraud or intent not to pay. Rather, the debtor's intent must be determined from the totality of the circumstances." *Capital One Bank v. Ferro (In re Ferro)*, 292 B.R. 160, 162-163 (Bankr. E.D. Mich. 2003).

-23-

Based on the totality of the circumstances, Kutsomarkos also survives summary judgment on Count II.  The Settlement Agreement was based on joint and several liability, which permits Dixit alone to make the payments.  In addition, Kutsomarkos's testimony was that even though she lacked the ability to make the monthly payments, she intended to earn her portion of the payments by helping Dixit with a project in exchange for Dixit making the settlement payments.

### C.    *Kutsomarkos's Damages would be the $1.25 Million Under the Settlement Agreement*

Kutsomarkos argues that the Settlement Agreement does not require the Court to determine that $1.25 million is the amount of Dr. Bojkovic's nondischargeable claim because it is simply a contract between the parties, and fraud damages must be proven to be the result of fraud, not just a breach of the Settlement Agreement.  According to Kutsomarkos, the Court must determine the extent to which Dr. Bojkovic was damaged as a proximate result of fraudulent conduct.  The Court disagrees.

The Court finds that if Dr. Bojkovic establishes at trial that Kutsomarkos was a knowing participant in Dixit's fraudulent scheme, all of Dixit's misrepresentations are attributed to Kutsomarkos as a co-conspirator. *In re Sturgeon*, 496 B.R. at 223-224.  As such, Dr. Bojkovic would be entitled to a nondischargeable judgment in the amount of $1.25 million as indicated in the Settlement Agreement.

## V.    CONCLUSION

Because there are genuine issues of material fact regarding: (1) whether Kutsomarkos was an unwitting participant in Dixit's scheme to defraud; and (2) whether Kutsomarkos intended to earn her portion of the settlement payments by helping Dixit on a future project, Dr. Bojkovic's motion for summary judgment is **DENIED**.

The Court sets a scheduling conference for ***December 13, 2021, at 2:00 p.m.***

**IT IS ORDERED**.

**Signed on November 29, 2021**

/s/ Mark A. Randon

**Mark A. Randon**
**United States Bankruptcy Judge**

-25-